# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| PATRICK O'DELL, | ) |
| Plaintiff, | ) |
| | ) No. 18 C 113 |
| v. | ) |
| | ) Judge Sara L. Ellis |
| CITGO PETROLEUM CORPORATION, | ) |
| Defendant. | ) |

## OPINION AND ORDER

Plaintiff Patrick O'Dell suffered an injury while working for Defendant Citgo Petroleum Corporation ("Citgo"), for which he filed a workers' compensation claim. After an extended absence, Citgo terminated O'Dell's employment pursuant to a loss of seniority provision in the collective bargaining agreement. O'Dell filed this suit against Citgo, alleging a common law claim that Citgo wrongfully terminated him in retaliation for filing a workers' compensation claim. Citgo now moves for summary judgment. Although the Court does not find that § 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185, preempts O'Dell's retaliatory discharge claim, the Court nonetheless finds summary judgment appropriate for Citgo because the evidence would not allow a reasonable jury to conclude that Citgo terminated O'Dell because he filed a workers' compensation claim.

## BACKGROUND[1]

### I. O'Dell's Employment with Citgo

Citgo, a refiner, transporter, and marketer of transportation fuels, lubricants, petrochemicals, and other products, operates a refinery in Lemont, Illinois. O'Dell began

---

[1] The facts in this section are derived from the Joint Statement of Undisputed Material Facts and attached exhibits. All facts are taken in the light most favorable to O'Dell, the non-movant.

working at Citgo's Lemont refinery on January 10, 2005. On April 1, 2013, Citgo promoted O'Dell to an Operations Technician A position on the Number One Cat Reformer. In this position, O'Dell engaged in physically intense and safety sensitive work to apply heat and pressure to crude oil. Citgo classifies this position as having heavy physical demands and requiring frequent walking, standing, pushing, pulling, and lifting or carrying of objects between fifty and 100 pounds. Operations Technicians must validate the required level of competence to perform their work. This validation requires Operations Technicians to demonstrate understanding of the position and duties and may include a physical component. Operations Technicians also have to complete a series of computer-based training programs called PRISM every year.

## II. Policies Applicable to O'Dell's Employment

Citgo has a collective bargaining agreement ("CBA") with Lemont Local No. 7-517 of the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union (the "Union"), which governed O'Dell's employment.[2] In Article IV, Section 7, titled "Loss of Seniority," the CBA provides:

> Plant seniority will be broken and lost in the following cases: . . .
>
> D. Any absence from work for more than eighteen (18) consecutive months. Time missed while on Family Medical Leave, Funeral Leave, and Jury Duty will not be counted toward the eighteen (18) month period.

Doc. 65-3 at 10; Doc. 65-4 at 10. The Loss of Seniority provision does not specify whether a return to work on transitional duty—also known as restricted, modified, or light duty—amounts to an absence or does not get counted in the eighteen-month period. Additionally, in Article IX,

---

[2] Technically, two versions of the CBA governed O'Dell's employment, one effective between 2012 and February 1, 2015, and the other effective from February 1, 2015, to February 1, 2019. Because the relevant provisions remain the same between the two agreements, the Court treats them as one.

Section 10, the CBA provides that Citgo may suspend, discharge, or otherwise discipline employees only for just cause.

The CBA includes a mandatory grievance and arbitration process for "differences . . . as to the meaning and application of the provisions of" the CBA. Doc. 65-4 at 22. The CBA outlines the steps in the grievance process as follows: (1) discussing the grievance with the employee's supervisor and, if not settled, reducing the grievance to writing; (2) having the grievance reviewed and potentially settled by the workmen's committee and the department head; (3) if not settled, appealing the decision of the department head to the Lemont refinery's vice president; and (4) referring any grievance not satisfactorily resolved under Step Three to arbitration. To the extent the grievance procedure resulted in a finding that Citgo unjustly discharged an employee, Citgo agreed to reinstate that employee without loss of seniority and with reimbursement for lost compensation.

Citgo has a transitional duty assignments policy intended to "assist employees whose recovery from injuries and/or illnesses may be enhanced by an early return to a working environment." Doc. 65-1 at 2. It provides for transitional duty subject to the determination of the employee's treating physician, Citgo's health services department, and the employee's supervisor and the "availability of safe, meaningful, and productive job duties (as determined by management) that are within the limits of the medical recommendations." *Id.* In order to qualify for transitional duty, the employee must have a temporary disability, reflected in a medical assessment that "indicate[s] a strong probability that [the employee] will be fully recovered and be able to perform the full scope of his/her regular work assignment, without restrictions, in the near future." Transitional duty could last up to six months, with an initial transitional duty

assignment lasting up to four weeks, and subsequent evaluations of the continued propriety of transitional duty occurring every one to four weeks thereafter.

### III.     O'Dell's Injury, Treatment, and Work Restrictions

On March 3, 2014, O'Dell claims to have injured his right shoulder while moving a steam hose at work. Michael Siron, a Citgo area manager and to whom O'Dell reported the accident, had some concerns that the accident, as O'Dell described it, could not have caused O'Dell's shoulder injury. O'Dell began a leave of absence on March 4, without a return to work date established. He filed a workers' compensation claim on March 19, 2014. ESIS, an independent third party that administers Citgo's workers' compensation claims, handled O'Dell's claim. The parties reached a settlement to pay O'Dell's claim, with O'Dell and ESIS executing a settlement agreement on June 15, 2017. Both Michael Urbas, another of O'Dell's supervisors, and Siron denied knowledge of O'Dell's workers' compensation claim.

After his injury, O'Dell sought treatment from several healthcare providers, including Ami Dose of OSF Healthcare and Drs. Giridhar Burra and Elliot A. Nacke of Hinsdale Orthopaedics. Between March 4, 2014, and May 19, 2014, O'Dell's treating physicians indicated he could not return to work. On May 20, 2014, Dr. Burra allowed O'Dell to work with the following restrictions: no lifting of more than one to five pounds, no overhead reaching, and no repetitive shoulder motion. That same day, Joan Bingham, the Lemont refinery's health services nurse, informed other Citgo employees, including Urbas and Siron, of O'Dell's restrictions. Urbas responded that Citgo could not accommodate O'Dell's restrictions, testifying that the severity of them rendered O'Dell unable to engage in productive, safe work in his unit. Bingham then notified O'Dell, who indicated he would provide another update in four weeks.

Over the next several months, O'Dell's restrictions remained the same, with none of the work status reports submitted by his doctors indicating when he could potentially return to full duty.

O'Dell had shoulder surgery in September 2014. After this surgery, his doctors reported that he could not work between September 4, 2014, and May 10, 2015. Before O'Dell had a second surgery on May 14, 2015, his doctors provided him with a three-day window between May 11 and May 13 when he could work with restrictions of no lifting greater than one to five pounds, no pushing or pulling, no overhead reaching, and no repetitive shoulder motion. On May 12, Bingham communicated these restrictions to the relevant decisionmakers, indicating the restrictions would last over thirty days. Siron responded that Citgo could not accommodate the restrictions at the time. Although Siron acknowledged that O'Dell could revalidate with those restrictions, because of operational needs at the refinery, Citgo did not have the personnel to oversee any such revalidation at that time. Siron suggested reevaluating the issue in July. But after the surgery and until October 11, 2015, O'Dell's doctors reported that O'Dell could not return to work, negating the opportunity to reevaluate the availability of revalidation opportunities.

In September 2015, O'Dell claimed he injured his right wrist during work conditioning, an intensive form of physical therapy mimicking his work environment. Dr. Burra referred O'Dell to Dr. Nacke, a wrist surgeon at Hinsdale Orthopaedics. On September 17, 2015, Dr. Nacke cleared O'Dell to return to work conditioning, and on October 8, he indicated that O'Dell could return to light duty with restrictions of no lifting, no pushing or pulling of over twenty pounds, and limited repetitive use of his right hand. On October 9, Dr. Burra allowed O'Dell to return to work with no shoulder restrictions as of October 12, but he deferred to Dr. Nacke with respect to O'Dell's wrist. On October 12, Bingham shared this information within Citgo. On

November 19, 2015, Dr. Nacke indicated O'Dell could return to work without restrictions on November 23, 2015.

## IV. O'Dell's Loss of Employment and Subsequent Grievances

Reviewing O'Dell's leave from work and the CBA, Richard Albaugh, the manager of human resources and administration at the Citgo Lemont refinery, and Jeffery Rutter, the labor relations manager there, determined that the CBA's Loss of Seniority provision dictated O'Dell's loss of employment as of October 23, 2015, when his contractually-provided seniority protected leave expired. Specifically, when O'Dell began his leave of absence on March 4, 2014, he had used twenty-five days of family medical leave, with thirty-five days remaining. He exhausted his family medical leave on April 21, 2014, meaning his contractually protected seniority leave began on April 22, 2014, and ended on October 22, 2015. Because O'Dell had not been released to return to full duty as to both his wrist and shoulder on October 23, 2015, his employment ended pursuant to the CBA's Loss of Seniority provision. Rutter informed O'Dell of this determination on November 20, 2015, by phone. Citgo also communicated the decision by letter dated November 25, 2015. O'Dell believes that he should not have lost his seniority because he could perform light duty. But he acknowledges that the CBA does not specify whether performing light duty would have prevented his seniority from expiring.

On November 25, 2015, O'Dell communicated a grievance to Citgo, claiming that Citgo violated Article IX, Section 10 by discharging O'Dell without just cause and Article IV, Section 7(D), the Loss of Seniority provision, when it informed him his employment ended. O'Dell claimed that Citgo could have offered him light duty work and could have avoided the issue if it had not attempted to deny his workers' compensation claim. This was the first time O'Dell formally communicated a grievance regarding the lack of light duty work. On January 15, 2016,

6

Citgo provided the Union with a Second Step Letter denying O'Dell's grievance. Citgo indicated that the requirement of just cause for a disciplinary action did not apply because Citgo did not terminate O'Dell for a disciplinary matter but rather for his continuous absence from work for over eighteen months. Citgo denied any discrimination and also stated that it did not have any available light work to accommodate O'Dell's restrictions at the times O'Dell was available for such work. On March 15, 2016, Citgo and the Union held a Third Step meeting regarding O'Dell's grievance but did not resolve it. On May 18, 2016, the Union formally requested arbitration, which the parties scheduled for September 20, 2016. Before the arbitration, O'Dell informed the Union that he did not want to return to Citgo and instead wished to continue working at Wedron Silica, where he had worked since December 21, 2015. The Union then withdrew O'Dell's grievance without prejudice or precedent on September 14, 2016, canceling the arbitration. O'Dell did not thereafter appeal the Union's withdrawal of the grievance.

In addition to pursuing the grievance process through his Union, O'Dell also filed a disability discrimination charge with the Illinois Department of Human Rights ("IDHR") on December 14, 2015, claiming Citgo retaliated against him for exercising his rights under the Illinois Workers' Compensation Act. The charge was cross-filed with the EEOC. On September 19, 2016, the IDHR issued a notice of dismissal for lack of substantial evidence. O'Dell did not file an administrative appeal or state court lawsuit based on the IDHR charge. The EEOC issued O'Dell a right to sue letter on February 15, 2017.

## LEGAL STANDARD

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56.

To determine whether a genuine issue of fact exists, the Court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. Fed. R. Civ. P. 56 & advisory committee's notes. The party seeking summary judgment bears the initial burden of proving that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). In response, the non-moving party cannot rest on mere pleadings alone but must use the evidentiary tools listed above to identify specific material facts that demonstrate a genuine issue for trial. *Id.* at 324; *Insolia v. Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). Although a bare contention that an issue of fact exists is insufficient to create a factual dispute, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), the Court must construe all facts in a light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

## ANALYSIS

**I.    Section 301 Preemption**

Citgo first argues that § 301 of the LMRA preempts O'Dell's claim. Section 301 preempts "claims founded directly on rights created by collective-bargaining agreements, and also claims 'substantially dependent on analysis of a collective-bargaining agreement.'" *Caterpillar Inc. v. Williams*, 482 U.S. 386, 394, 107 S. Ct. 2425, 96 L. Ed. 2d 318 (1987) (quoting *Elec. Workers v. Hechler*, 481 U.S. 851, 859 n.3, 107 S. Ct. 2161, 95 L. Ed. 2d 791 (1987)). "If the resolution of a state law claim depends on the meaning of, or requires interpretation of, a collective bargaining agreement, the application of state law is preempted and federal labor law principles must be employed to resolve the dispute." *Atchley v. Heritage Cable Vision Assocs.*, 101 F.3d 495, 499 (7th Cir. 1996).

To establish retaliatory discharge under Illinois common law, O'Dell must establish (1) Citgo discharged him (2) in retaliation for his exercise of his rights under the Illinois Workers' Compensation Act. *See Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 773 (7th Cir. 2012). Examining whether § 301 preempted such a claim, the Supreme Court in *Lingle v. Norge Division of Magic Chef, Inc.* concluded that the elements of retaliatory discharge under Illinois law, as well as an employer's defense to such a claim, do not require interpretation of a collective bargaining agreement. 486 U.S. 399, 407, 108 S. Ct. 1877, 100 L. Ed. 2d 410 (1988). Instead, the *Lingle* Court found that "these purely factual questions pertain[ ] to the conduct of the employee and the conduct and motivation of the employer." *Id.*

But *Lingle* acknowledged that § 301 preempts a state law claim where the claim requires interpretation of a collective bargaining agreement. *Id.* at 413. Therefore, Citgo argues that *Lingle* does not preclude finding preemption here, contending that the Court must interpret the CBA to address O'Dell's argument that, had Citgo provided him with light duty work at some point before eighteen months passed, he would not have lost his seniority and not lost his job. Citgo claims that accepting O'Dell's argument requires finding an exception to the CBA. But O'Dell does not argue that Citgo misinterpreted the Loss of Seniority provision, acknowledging that, under the established facts, he lost seniority under the provision. Instead, O'Dell claims that Citgo acted in a retaliatory manner by refusing to provide him with light work within that eighteen-month period, which would have allowed him to retain seniority. Although Citgo attempts to create an interpretation issue by suggesting a dispute exists as to whether a return to light duty work would prevent an employee's seniority from expiring, the Court understands the appropriate inquiry here to encompass whether Citgo acted in a retaliatory manner to prevent that question from even arising. Such an inquiry does not depend on the interpretation of the CBA

9

but rather the facts behind Citgo's decision not to return O'Dell to light duty.³ *See id.* at 407; *Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 833 (7th Cir. 2014) (plaintiff's retaliation claim not barred by the Railway Labor Act's mandatory arbitration provision for claims grounded in a collective bargaining act because plaintiff did not claim "she was entitled to a particular job under the collective bargaining agreement" but rather that "her applications were rejected . . . in retaliation for protected activity," which required a factual inquiry into the employer's retaliatory motive instead of an interpretation of the collective bargaining agreement); *Rabe v. United Air Lines, Inc.*, 636 F.3d 866, 873 (7th Cir. 2011) (finding Railway Labor Act did not preempt discrimination claims where "[t]he collective bargaining agreement is relevant to Rabé's claims because she alleged that the travel-voucher policy was enforced against her in a discriminatory manner, but her claims do not call the policy itself into dispute"). Therefore, the Court refuses to find O'Dell's claim preempted and proceeds to consider it on the merits.

## II. Merits of O'Dell's Claim

Proceeding to the merits of O'Dell's retaliatory discharge claim, as discussed above, O'Dell must establish that Citgo discharged him for exercising his rights under the Illinois Workers' Compensation Act. *Gordon*, 674 F.3d at 774 ("[T]o establish a causal relationship, [a plaintiff] must affirmatively show that the discharge was primarily in retaliation for [her] exercise of a protected right.'" (third alteration in original) (quoting *Roger v. Yellow Freight Sys.*, 21 F.3d 146, 149 (7th Cir. 1994))). Citgo argues that O'Dell cannot establish a causal connection between the filing of his workers' compensation claim and the loss of his employment. The fact that O'Dell's "workplace injury and initiation of a workers' compensation

---

³ Citgo attempts to shoehorn the application of its transitional duty policy into the preemption analysis, arguing that "Plaintiff now asserts that CITGO should have made an exception to the CBA and the Transitional Duty Policy and let him come back to work for training . . . to preserve his seniority." Doc. 64 at 5. But the record does not support finding that interpretation of the transitional duty policy, which does not form a part of the CBA, requires preemption under § 301.

10

claim set in motion a chain of events that ended in his discharge" does not suffice to establish causation. *Hillmann v. City of Chicago*, 834 F.3d 787, 794 (7th Cir. 2016). And although O'Dell carries the burden to show causation, he cannot establish causation to the extent Citgo has a valid, nonpretextual basis for the discharge. *Hartlein v. Ill. Power Co.*, 601 N.E.2d 720, 728, 151 Ill. 2d 142, 176 Ill. Dec. 22 (1992). Here, among other things, Citgo relies on O'Dell's loss of seniority to negate any causal connection. *See id.* ("[A]n employer may fire an employee for excess absenteeism, even if the absenteeism is caused by a compensable injury."). And although O'Dell acknowledges that, because he did not return to work, he lost seniority under the CBA, he claims that Citgo actively prevented him from returning to work within that eighteen-month period because it refused to bring him back for light duty during that time.

O'Dell's focus on Citgo's failure to provide him with light work precludes relief, for O'Dell can only recover for retaliatory termination, not for other allegedly retaliatory actions taken by Citgo prior to the termination. *See Metzger v. DaRosa*, 805 N.E.2d 1165, 1173, 209 Ill. 2d 30, 282 Ill. Dec. 148 (2004) (noting that, although Illinois recognizes a retaliatory discharge claim, it has "*never* recognized a common law tort for any injury short of actual discharge"); *Welsh v. Commonwealth Edison Co.*, 713 N.E.2d 679, 683, 306 Ill. App. 3d 148, 239 Ill. Dec. 148 (1999) ("[Illinois] has not expanded the tort of retaliatory discharge to encompass any behavior other than actual termination of employment."). And, because O'Dell does not contest the termination decision based on his loss of seniority under the CBA or provide any argument that that decision was pretextual, he cannot establish the required causation for a retaliatory discharge claim. *See Dotson v. BRP U.S., Inc.*, 520 F.3d 703, 710 (7th Cir. 2008) (district court properly granted summary judgment for employer where nothing in the record "calls into

question the company's stated reason for the termination, that Dotson exceeded the twelve-week leave period allowed by the company's absenteeism policy").

But even considering O'Dell's theory of retaliation, the record does not include evidence from which a reasonable juror could conclude that O'Dell's filing of a workers' compensation claim caused Citgo to deny him the opportunity to return to light duty before the eighteen-month period expired. O'Dell argues that he could have performed certain light duty assignments during this eighteen-month period, but he does not specify the time periods or the available work. Such a vague argument, without appropriate citation to evidence in the record, cannot create a genuine dispute of fact. *See United States v. Elst*, 579 F.3d 740, 747 (7th Cir. 2009) ("Perfunctory and undeveloped arguments as well as arguments unsupported by pertinent authority are waived."); *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003) ("Summary judgment 'is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events.'" (quoting *Schacht v. Wis. Dep't of Corr.*, 175 F.3d 497, 504 (7th Cir. 1999))). And the record does not suggest that O'Dell actually requested light duty at any time, with him instead only raising the issue through the grievance process after his termination. To the extent O'Dell contends that Citgo should have allowed him to revalidate and complete the PRISM training in May 2015, the record indicates that Citgo could not accommodate his restrictions at that time because it had no one available to oversee the revalidation process.[4]

---

[4] O'Dell contends that Citgo "systematically failed" to provide him with light duty work after May 2015, Doc. 68 at 9, but the record does not include any suggestion of such a systematic failure. Instead, the record indicates that O'Dell could have returned for a brief three-day period in May, but that, after that short window through October 11, his doctors indicated he could not work at all. And while Siron suggested in May that Citgo could reevaluate whether O'Dell could revalidate in July, at that time, O'Dell's doctors indicated he could not return to work, even with restrictions. This series of events undermines any suggestion that Citgo systematically failed to allow him to return for light duty. And

Moreover, Citgo's transitional duty policy provides that, before allowing for light work, "[t]he probability of return to regular work must be known." Doc. 65-1 at 2. At no time within the relevant eighteen-month period did O'Dell or his doctors provide Citgo with information about his ability to return to regular work without restrictions, and his doctors only fully released him to work on November 23, 2015. To the extent Citgo allowed other individuals to complete computer training or revalidation while under restrictions, those employees remained on light duty before returning to full duty only for a short period of time, either a week or two weeks. Citgo never received information that O'Dell could return in a similar period of time so as to make these individuals comparable and suggest that Citgo had a retaliatory motive in keeping work from O'Dell. Because O'Dell did not qualify under Citgo's transitional duty policy for light duty work at any time during the relevant eighteen-month period, he cannot use Citgo's failure to return him to light duty work to create a question of fact as to causation.

O'Dell also argues that Siron and other decisionmakers had ulterior motivations in denying him the right to light duty work. Siron acknowledged that he did not believe O'Dell's story as to how he suffered the shoulder injury. And, in an email concerning whether O'Dell could return for transitional duty in May 2015, Siron noted that he had certain thoughts he could not put in writing, which Siron explained related to his belief that O'Dell had lied about how his injury occurred. Siron's suspicions may create a question of fact as to the reason for withholding light duty work from O'Dell. But nothing ties these questions about his injury to the workers' compensation claim. *See Deacon v. Peninsula Chicago, LLC*, No. 16-cv-1464, 2017 WL 3531518, at *14 (N.D. Ill. Aug. 17, 2017) (refusing to infer retaliatory motive based on comment about plaintiff's injury and subsequent restrictions, which "had nothing to do with Plaintiff's

---

although O'Dell could have returned with certain wrist restrictions after October 11, O'Dell does not point to anything in the record suggesting that Citgo could provide him with light duty at that time.

13

workers' compensation claim"); *cf. Clark v. Owens-Brockway Glass Container, Inc.*, 697 N.E.2d 743, 746, 297 Ill. App. 3d 694, 232 Ill. Dec. 1 (1998) (finding employee established causation where employer admitted that discharge was based on workers' compensation filing, specifically, the industrial relations director's belief that employee was collecting benefits to which she was not entitled and employer's "claim [that] she was guilty of fraudulent acts justifying the termination of her employment"). Moreover, Siron, as well as Urbas, denied knowledge of O'Dell's workers' compensation claim, preventing the Court from drawing any connection from their actions to the filing of that claim. *See Hillmann*, 834 F.3d at 794 ("[U]nder Illinois law a claim for retaliatory discharge requires—at a minimum—that the relevant decision-maker knew that the employee intended to file or had filed a workers' compensation claim.").[5] Because O'Dell has not offered evidence from which a reasonable jury could conclude that Citgo terminated his employment or even withheld light duty work from him because of his claim for benefits, the Court grants summary judgment for Citgo.

## CONCLUSION

For the foregoing reasons, the Court grants Citgo's motion for summary judgment [62]. The Court enters judgment for Citgo on O'Dell's complaint and terminates this case.

Dated: October 7, 2019

_____
SARA L. ELLIS
United States District Judge

---

[5] Although Siron and Urbas did not play a role in terminating O'Dell's employment, they appear to have had a role in determining whether O'Dell could return to light duty.